# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-21-00497-CR

---

**Jesse Wyatt Vickers, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 26TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 18-2212-K26, THE HONORABLE DONNA GAYLE KING, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

A jury convicted Appellant, Jesse Wyatt Vickers, of the first-degree felony of murder and assessed his punishment at 20 years in prison, and the trial court rendered judgment accordingly. *See* Tex. Penal Code §§ 12.32, 19.02. In two appellate issues, Appellant maintains that the court should have instructed the jury on the defensive issue of defense of a third person, *see id.* § 9.33, and that the court abused its discretion by letting the jury view the car that Appellant used in the murder. We affirm.

### BACKGROUND

Appellant killed Frederick Goodrow, Appellant's cousin, by hitting him with a car. That night had begun with a family-and-friends get-together hosted by Steven and Lea Dykes in

their yard.[1]  Guests included neighbors, Goodrow, his girlfriend, Kenneth Stuart, Appellant, and others.[2]  Goodrow was about six years older than Appellant, and the two grew up together in the same home once Appellant came to live there after his mother died.

On the night in question, the attendees at the party socialized, and many, including Goodrow and Appellant, drank alcohol, some for hours.  Goodrow and Appellant usually experienced tension between each other—Goodrow often told Appellant to be more of a man and to help pay his household's bills.  At least one family member believed that Goodrow had long bullied Appellant.  And another knew of "years of resentments between the two of them."  But on this night, Goodrow and Appellant started out getting along.

The tenor of the party soon changed.  Goodrow and his girlfriend, Gabrielle Carnicle, started arguing about their relationship.  Others interjected themselves.  Some did so because Goodrow was well known for aggression and even violence, especially when drunk, as he then was.  What happened from this point on is disputed, but Goodrow and Stuart eventually got into a scrap with one or both of them going to the ground.  Amid this, Appellant mounted a nearby tree stump.  Goodrow approached him and, for one reason or another, made some sort of movement with his arms towards Appellant.  Lea believes that Goodrow pushed Appellant backwards nearly into a tree, but others believe that Goodrow missed in his attempt to muscle Appellant off the stump. From there, the interactions between Goodrow and Appellant are still unclear.  Lea believes that Goodrow had Appellant "in one hand and was like flinging him around like a rag doll" with

---

[1]  Because the Dykeses share a surname, we refer to them each as "Steven" and "Lea."

[2]  Lea and Appellant are siblings.  Goodrow's father is Stuart's first cousin.  And Appellant and Goodrow share a grandmother.

2

other attendees trying to protect Appellant from Goodrow. But others believe that in any of the physical commotion that surrounded Goodrow, Appellant was not involved.

Either way, several of the attendees by that point had confronted Goodrow to get him to stop, so he ran inside the home to get his friend Steven. It was well after midnight, and Steven demanded that everyone leave his property. There's more uncertainty around whether Goodrow made an aggressive move toward Appellant near the home's porch, but the group ultimately separated when Stuart invited Goodrow to sleep everything off at Stuart's home nearby.

The two walked out of the Dykeses' yard and down their driveway to the public street and then walked down the street out of the view of the attendees who stayed behind. Stuart says that Goodrow was angry, mumbling, growling, and snarling. Yet Stuart was unafraid of Goodrow. According to Stuart, Goodrow had no weapons with him, the two weren't saying anything to each other as they walked side-by-side about two feet apart, and at no point did Goodrow do anything physical to Stuart.

Back in the Dykeses' yard, Lea began to hear what "sounded to" her like Goodrow "was beating up" Stuart. Lea says that she, Carnicle, and Steven all looked at each other wondering what Goodrow was doing. It sounded to Lea "like gurgling or something," "loud gurgling," "like [Goodrow] was choking" Stuart. Lea would go on to say, however, that she later learned from Stuart that the noises she was hearing were simply of Goodrow hitting a trash can or tree or something similar—that what she thought was happening was in fact not happening.

But because of the sounds she says she heard at the time, Lea says she screamed at Appellant, "Just go do something," and, "[M]ake yourself useful and help" Stuart. Appellant then got in a car. He backed it down the driveway toward the street, and in the street, he turned it to face Stuart and Goodrow.

Stuart says that he heard the car shortly after it reached the street. He says that Goodrow heard the car as well and turned around while Stuart himself kept walking a little, growing the distance between the two men to about four feet. At this moment according to Stuart, anyone driving that car with the headlights on, as they were, would have seen simply two people walking and would not have seen any physical contact between Goodrow and Stuart. Any driver, Stuart believes, could not have mistaken the situation by believing that Goodrow was then assaulting Stuart.

When he eventually turned around to look at the car, Stuart saw it hit Goodrow. Goodrow went "over the car" and landed in the street. Back in the yard, Steven ran away from the others who were still there and toward the street to see what the noise was. He went back to them to tell them to call 911. The car sped down the street a little further. Some of the others approached Goodrow. He was alive. He was lying in the road and moving his head. The car turned around. With Appellant "floor[ing] it," the car ran over Goodrow again with "no hesitation."

Goodrow, moaning, tried to get up, but Stuart lay down next to him and told him not to move. The car turned around in the cul-de-sac. It moved quickly toward the group who had gathered around Goodrow. But it veered away at the last minute off the side of the road to avoid the group and then sped off. Although still alive when Appellant drove off, Goodrow was soon pronounced dead by paramedics.

Appellant was indicted for murdering Goodrow. He was tried before a jury on the theory of murder for intending to cause serious bodily injury and committing an act clearly

dangerous to human life that caused Goodrow's death.[3]  *See* Tex. Penal Code § 19.02(b)(2).  The trial court admitted as evidence pictures of the car taken not long after the murder, and the jury heard testimony describing those pictures as accurately reflecting what the car looked like immediately after the murder and then was allowed to view the car itself.  The court also refused Appellant's request for a jury defensive instruction on defense of a third person.  *See id.* § 9.33.  The jury found him guilty as alleged in the indictment, and he was sentenced to 20 years in prison.  He now appeals.

## JURY CHARGE—DEFENSE OF A THIRD PERSON

In his first issue, Appellant maintains that the trial court erred by refusing a jury instruction on defense of a third person.  *See id*.  We review a claim of charge error under a two-step framework.  *Harmel v. State*, 597 S.W.3d 943, 956 (Tex. App.—Austin 2020, no pet.).  We first decide whether the claimed error exists in the charge.  *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); *Harmel*, 597 S.W.3d at 956.  "[A]ll alleged jury-charge error must be considered on appellate review regardless of preservation in the trial court."  *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *accord Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003).  Second, if there is error, we evaluate the harm caused by the error.  *Ngo*, 175 S.W.3d at 743; *Harmel*, 597 S.W.3d at 956.  The amount of harm needed for a reversal depends on whether the defendant preserved the error for review.  *Swearingen v. State*, 270 S.W.3d 804, 808 (Tex. App.—Austin 2008, pet. ref'd).  If preserved, as here, we must reverse if the error caused "some harm."  *Braughton v. State*, 569 S.W.3d 592, 613 (Tex. Crim. App. 2018).

---

[3] The State abandoned a second murder count, under which it had alleged the theory of murder for intentionally or knowingly causing Goodrow's death.  *See* Tex. Penal Code § 19.02(b)(1).

A trial court must instruct the jury on the "law applicable to the case." Tex. Code Crim. Proc. art. 36.14. "The issue of the existence of a defense is not submitted to the jury unless evidence is admitted supporting the defense." Tex. Penal Code § 2.03(c). A defense is raised by the evidence only "if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true." *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007). "In determining whether a defense is thus supported, a court must rely on its own judgment, formed in the light of its own common sense and experience, as to the limits of rational inference from the facts proven." *Id.* at 658. "A defendant is entitled to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of the trial court's opinion about the credibility of the defense." *VanBrackle v. State*, 179 S.W.3d 708, 712 (Tex. App.—Austin 2005, no pet.).

As alleged in the indictment, a person commits murder if the person "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code § 19.02(b)(2). The person, however, may be justified in using deadly force against another to defend a third person. *See id.* §§ 9.32, 9.33. The elements of the defense are:

> (1) under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and
>
> (2) the actor reasonably believes that his intervention is immediately necessary to protect the third person.

*Id.* § 9.33. "The focus of the defense-of-third-persons defense is upon what the actor reasonably believes concerning the situation of the third person." *Morales v. State*, 357 S.W.3d 1, 8 (Tex. Crim. App. 2011). "'Reasonable belief' means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." Tex. Penal Code § 1.07(a)(42).

As relevant here, the elements to justify the use of deadly force are:

(1) if the actor would be justified in using force against the other under Section 9.31; and

(2) when and to the degree the actor reasonably believes the deadly force is immediately necessary:

(A) to protect the actor against the other's use or attempted use of unlawful deadly force; or

(B) to prevent the other's imminent commission of . . . murder.

*Id.* § 9.32(a). "'Deadly force' means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3). In the context of self-defense and defense of a third person, force that is immediately necessary to protect oneself or another from a person's use of unlawful force is force that is needed at that moment—when a split-second decision is required. *Henley v. State*, 493 S.W.3d 77, 89–90 (Tex. Crim. App. 2016).

Appellant argues that the evidence raised a rational inference on every element of defense of a third person because, he says, the evidence supported a reasonable belief that deadly force was immediately necessary to protect Stuart from Goodrow. Appellant's brief expressly relies on the following from Lea's testimony: (1) that Goodrow was aggressive and fought with Carnicle, Stuart, Appellant, and her on the night in question; (2) that after Steven had told everyone to go home, Goodrow ran after Appellant, and Lea and Carnicle had to pull Appellant over a

7

fence-like structure near the porch to help him escape; (3) that after Stuart and Goodrow had left the rest of the attendees' sight to walk down the street, Lea heard what "sounded like" Goodrow "beating up" Stuart and "gurgling or something," "loud gurgling," like Goodrow "was choking" Stuart; and (4) that at that moment Lea screamed at Appellant, "Just go do something," and "[M]ake yourself useful and help" Stuart.

The first and second items from Lea's testimony together but without more do not support the requested instruction. The most those items show, either directly or by reasonable inference, is that some time before Appellant ran Goodrow down, Goodrow had been violent with some of the attendees. But the immediate-necessity element of the requested defense requires evidence of force that is needed in the moment when a split-second decision is required. *See Henley*, 493 S.W.3d at 89–90; *see also McDonald v. State*, 597 S.W.2d 365, 367 (Tex. Crim. App. [Panel Op.] 1980) (evidence did not raise defense of third persons—defendant's wife and young daughters—even though defendant testified that wife and daughters were "in another part of [defendant's] house" and would be dead next if he did not kill trespasser who was wielding knife). This means that there needed to be evidence that Goodrow was being unlawfully violent with Stuart at the moment that Appellant engaged the car to run over Goodrow. The first and second items do not support anything in that key moment and thus do not support raising the defense.

Adding the third and fourth items presents a closer question but still does not raise the defense. From these items, we must infer that some choking was indeed occurring for Lea to have heard it and for her to have screamed at Appellant to respond. This is in part because we must view the record in the light most favorable to the requested instruction, *see Maciel v. State*, 631 S.W.3d 720, 722 (Tex. Crim. App. 2021), and because Lea's later testimony, and Stuart's testimony, that no choking happened cannot erase what Lea otherwise testified to, *see Lugo v.*

8

*State*, 667 S.W.2d 144, 146–47, 149 (Tex. Crim. App. 1984) (because factfinder may believe some of one witness's testimony but reject other of same witness's testimony, testimony by that witness raising defensive issue still raises the issue even if the witness gives other testimony tending to negate the issue).[4]  But it is not reasonable to infer that the choking continued from the time that Lea heard it to the time that Vickers first ran over Goodrow with the car.  Lea did not observe what the two men were doing at the moment that Goodrow ran down Stuart, nor did she relate anything to Goodrow about that moment.  Plus, even though Lea testified that what she heard was *Goodrow's* choking Stuart, her testimony is no evidence that *he* was doing so because Lea could not rationally have inferred whether it was Goodrow or Stuart who was doing the choking.  It is undisputed that Lea could not see what, if anything, was transpiring between the two men, and her only stated basis for testifying that it was Goodrow doing the choking was that she heard the gurgling noise.  Lea's testimony that Goodrow was the one doing the choking is therefore conclusory and is no evidence on the relevant issue.  *See Arnwine v. State*, 20 S.W.3d 155, 159–60 (Tex. App.—Texarkana 2000, no pet.) (conclusory testimony did not raise requested defense).  Without evidence from which a reasonable inference could be drawn that *Goodrow* was choking Stuart at the key moment, there is no evidence to support the element of the requested defense that intervention was necessary to protect *Stuart*.  *See* Tex. Penal Code § 9.33(2).  In all, we conclude that the evidence did not support a rational inference on all the elements of the requested defense

---

[4] *See also Bell v. State*, 693 S.W.2d 434, 442–43 (Tex. Crim. App. 1985) (applying these principles from *Lugo*); *Frank v. State*, 688 S.W.2d 863, 868 (Tex. Crim. App. 1985) ("In determining whether evidence has been presented which raises the issue of a defensive charge, we must consider *all* of the evidence presented at trial regardless of whether it is 'strong, weak, unimpeached, or contradicted.'" (quoting *Booth v. State*, 679 S.W.2d 498, 500 (Tex. Crim. App. 1984), and citing *Lugo*)).

and hold that the trial court did not err by refusing to instruct the jury on defense of a third person. We overrule Appellant's first issue.

## JURY VIEW—RULE OF EVIDENCE 403

In his second issue, Appellant maintains that the trial court abused its discretion by allowing the jury to view the car used to kill Goodrow. Appellant's objection at trial was that a jury view would be misleading, and Appellant argues from Rule of Evidence 403 on appeal.[5]

Under Rule 403, if the probative value of relevant evidence is substantially outweighed by certain dangers, then the evidence is inadmissible. *Gonzalez v. State*, 544 S.W.3d 363, 371 (Tex. Crim. App. 2018). The dangers include "unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010). The rule calls for a balancing test, under which the analysis includes, but need not be limited to, four factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for it. *Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019). Probative value is "the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—

---

[5] On appeal, Appellant also argues relevance from Rules of Evidence 401 and 402, but he did not object based on relevance in the trial court. His only objection—"misleading"—is one of the dangers identified in Rule *403*. To properly preserve a complaint about the admission of evidence, a party must state the grounds for the ruling sought "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." *Douds v. State*, 472 S.W.3d 670, 674 (Tex. Crim. App. 2015) (internal quotation omitted) (quoting Tex. R. App. P. 33.1(a)(1)(A)).

coupled with the proponent's need for that item." *Davis*, 329 S.W.3d at 806. "'Misleading the jury' means a risk that the evidence would be given undue weight for reasons other than emotional ones; an example is scientific evidence that a jury is not equipped to judge." *Valadez v. State*, 663 S.W.3d 133, 142 (Tex. Crim. App. 2022). Rule 403 balancing "is always slanted" in favor of admissibility. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009).

Viewing the car had some probative value for the State's case—it helped show the damage to the vehicle caused by Appellant's driving it into Goodrow. This in turn helped prove elements of the State's case, including "serious bodily injury" and an "act clearly dangerous to human life." *See* Tex. Penal Code § 19.02(b)(2); *Inthalangsy v. State*, 634 S.W.3d 749, 758 (Tex. Crim. App. 2021). This first factor thus weighs in favor of admission.

Under the second, we are guided by the definition of "misleading the jury" from *Valadez* and conclude that this factor is neutral. A jury view of the car without more would have risked the jury's giving the car's condition undue weight because the car was in a different condition when the jury saw it than what the car looked like immediately after the murder.[6] But before the jury view, testimony by a crime-scene investigator confirmed that the picture exhibits that were before the jury gave an accurate picture of what the car looked like immediately after the murder. Armed with this knowledge, the risk that the jury would have over-relied on what they saw of the car in person was mitigated, and this factor is neutral.

Under the third, time factor, the record suggests that the State's request for the jury view and the view itself took no more than about 10-to-15 minutes of what was a three-day

---

[6] For example, the windshield, which was damaged on the night of the incident, had since fallen out of the car's pillars entirely.

guilt–innocence phase of trial in all (excluding voir dire). We do not see this as an inordinate amount of time and conclude that this factor weighs in favor of admission.

The last factor is the State's need for the jury view, and its need was almost nil. The photos more accurately showed the condition of the car immediately after the murder, and plenty of other evidence, both testimonial and by exhibit, established that Appellant hit Goodrow with the car, which was an act clearly dangerous to human life that caused Goodrow to die. This last factor weighs against admission.

Under all the factors together, with two favoring admission, one against it, and one neutral, we conclude that the trial court acted within its discretion to permit the jury view because the purported danger of misleading did not "substantially" outweigh the probative value of the jury view. *See* Tex. R. Evid. 403. We overrule this issue.

## CONCLUSION

We affirm the trial court's judgment.

_____
Chari L. Kelly, Justice

Before Justices Baker, Kelly, and Theofanis

Affirmed

Filed: September 28, 2023

Do Not Publish

12